The next case for argument is S.E.C. v. Allen Cohen v. Martin Armstrong Good morning, Your Honor. My name is Thomas Shoblom. I'm here on behalf of appellant Martin Armstrong. This appeal is about one man's right to get his personal property back, and that of an institute, property that was acquired before any of the conduct alleged in this civil and criminal complaint. It's also about the S.E.C. and the receiver's obligation to return that property. I'm curious, if you will, you don't have to do it right now, but sometime early on, would you explain to me, the language that we're dealing with here seems to deal with the S.E.C. And I'm interested in what the S.E.C. has to do with the material that you're . . . Certainly. I will address that in one second. The last point I wanted to make, it's about the absence of a hearing in the district court to resolve these property issues, which I think would have prevented us from coming up here. With respect to your question, the S.E.C. and the CFTC disregard the contractual obligations, in particular, to answer your question, Your Honor, section three of the final judgment stated that the S.E.C. shall assist the court, the receiver, and the parties in returning to Armstrong the property that belongs to him. That appears in our appendix, page 145. But the affidavit of neglige of the paralegal says he went to three different facilities, and at each of those facilities, he took personal items . . . Correct. And said, you know, I'll come back for the rest of them, and never followed up on them. What was he supposed to do? Two points, I think. Number one, it is true. He went to the storage facilities. He did arrive in a rental car, and he did take those few items that he could carry away. With respect to what he was supposed to do, looking . . . and we provided pictures of those storage facilities. You're talking about 9,000 square feet of stuff, boxes stacked on top of boxes, where he could not climb to the back, see things. They used masks. They said it was dusty and dirty. There's no inventory for him to identify anything. We proposed that he take the property, take it to Florida, sort through it, discard whatever he wants to sort through. It was impractical, Your Honor, to take all 9,000 square feet of property away in a rental  There was an offer made at one point in time to . . . Well, how does he get to Florida? 9,000 square feet? I mean, I've built houses. 9,000 square feet is a heck of a lot of space. Just exactly where I was going. One of the people that owned the warehouse was also a mover. He made arrangements with the mover to get a charge, give us how much it would cost, arrange for the truck, load the trucks, and that person that owned one of those facilities had a moving service, and he was going to pay it at his expense to have it moved down to Florida. Does that answer your question? I guess, but that really seems impractical. They want to sell the rest of the stuff that he's not claiming, right, or somehow dispose of it and put more money into them. With respect to that, the stuff has virtually zero value. You're talking about a coin safe of 400 pounds that he had back in his early days in the 1970s. You're talking about office furniture that was owned by the Institute, actually was purchased by a predecessor corporation called Economic Consultants. You're talking about furniture that might be 20, 30 years old or more. You're talking about his father's property, his father's library from the 1930s. I don't know how the receiver can take that property and claim it to belong to the receivership. Gifts from his mother, gifts from his clients. Did you ever hire anybody to go there and fill up the truck? We tried. We offered to have someone give us a proposal on the price to fill it up. You offered to have Neglia give you a proposal on the price. No, no. There's a mover. I think his name was Ortiz. Mr. Ortiz owned one of the facilities. When Mr. Armstrong was there and took those few items in his rental car, he asked Mr. Ortiz to give him a proposal, how much it would cost. He was willing to pay for it, willing to have it shipped down and go through it. If you can get your guy to give me a quote ASAP, why are they supposed to do that? We did. We did. We did do it. We did do it. What'd you do? Mr. Armstrong asked Mr. Ortiz for a proposal, cost, shipping, arranged the truck, and unfortunately  After we got the proposal. He did do it. What fault is that? I don't want to say fault here at any point. The discussion's broke down. The whole point of this appeal is fault. Okay. Well, I'm not arguing with it. I'm just asking you, how do you get to the point where it's the receiver's fault for not shipping this to you? We never asked the receiver to ship it. We said we would do it. Mr. Armstrong agreed to do it. He agreed to pay for it. He agreed to arrange for the shipping. So was there a truck that showed up and the receiver said, sorry? We never got that far. The receiver said, hold off everything. He said, wait until everything is concluded, then we'll work this out. Wait until the district court finalizes the case, then we'll figure out what to do. Mr. Armstrong was unwilling to give up his rights at that point in time and roll the dice. He said, I'll pay for it. I'll arrange the shipping. I'll arrange the mover. And the receiver said no. Where's that in the record? It is not. It is not in the record. It's in Mr. Armstrong's affidavit, and I think some of it is in Negley's affidavit. Some of the, and there's correspondence between the receiver and myself that talks about that. It concluded with, don't make a tempest in the teapot, I think was the last words that we received. Has this been through mediation? We thought there was a possibility to do that. We couldn't get there. I don't know why we're sitting here. I mean, if this were trial court back in Vermont, the trial judge would be beating us up, both, and saying, you get out of the back room, figure this out, settle it, and don't come back in until you've got a plan that you're going to sign off on and figure it out and stop wasting the court's time. We went that route for a short period of time. I don't know why it ended up stopping. We thought we were going in that direction. I was hoping that we'd go that direction, but we never got there. You want us to tell you to get there? I'm more than willing to, I'm willing to go there. You have other parties, you have other parties at the table that have to agree to it as well. We had hoped that that's where we were going to resolve this, but then again, it stopped. My other point about some of this property is, I don't think you can receive ... The property is now ... Pardon me? I think that the property is now gone, that is to say it can't be recovered. No, the property still sits in those storage facilities. It's all still there. It's not been moved. All we're asking is to go back to the ... I understand what the problems are, but he could still go out there and put on the mask again and have helpers or whatever it is. The property is there, it's just a question of what happens to it. We need the receiver's permission to go in there? The property is there, you need whatever you need, but it's still there. It's not a move question, you're not looking for money for the property, you're looking for the property. We're looking for the property, correct. Okay, anything else at this point? I'll reserve. Thank you. Your Honor, Tancred Schiavone for the receiver. For Mr. Cohen, right? Yes, Mr. Cohen. I'd like to take head on your question about mediation because I would submit that this appeal as presented to you is very hard to understand from a practical perspective. I mean, I will get to the law and why I think the district court did not abuse its discretion, but I fully admit that this is very difficult to understand why we're here over what's in the storage facilities. If you just give me a minute on this, the last time we were before this court resulted in a very lengthy published decision, Armstrong v. Guccione, 470 F. 3rd, 89. It involved a protracted civil contempt finding. This case arises from a massive international fraud where over a billion dollars was defrauded from Japanese note holders. In the run up to the arrest of Mr. Armstrong, he laundered a large amount of the proceeds into physical assets that were easily disposable and not held in possession. We're talking about about $400,000 to $500,000 a piece. I don't want to cut you short, but all of that is sort of water under the bridge and resolved, right? Or am I wrong about that? You are wrong because let me just get to the point, and I'm sorry for going on about it, but the contempt was dissolved on the finding that it didn't have coercive effect. Not on the finding that Mr. Armstrong wasn't still in possession of the items. What we have faced since then is a protracted, aggressive series of challenges at the district court level and multiple, multiple appeals, all designed to hold up distributions to the victims, to extort from the victims a general release so that those items can be marketed. We cannot . . . we made every reasonable accommodation to resolve what's in those lockers. I'm just saying, let me just be very simple. If you prevail, all the stuff that we've been talking about in the warehouse gets whatever's left there is liquidated and that money is distributed. It would be, but I'm also telling you that we would have made any accommodation . Ricardo Ricardo . Ricardo . . . . . . . . . . . . . . . . . . . . . . . the way to